IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Page Plus of Atlanta, Inc., et al., | Case No. 3:11 CV 2757 |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Owl Wireless, LLC, | |
| Defendant. | |

## INTRODUCTION

This is a dispute between Plaintiffs, Page Plus of Atlanta, Inc. and SNAP Prepaid, LLC ("PPA"), affiliated distributors, and Defendant Owl Wireless, LLC ("Owl"), a wholesale supplier. Both parties are involved in the business of prepaid phone cards and cell phones (referred to as "handsets" by the parties). PPA alleges breach of an October 2008 Distribution Agreement ("Agreement") and a July 2010 oral renegotiation of the Agreement based on Owl's alleged failure to follow certain pricing provisions and negotiate in good faith (Doc. No. 1 at 9–12). Owl counterclaims, alleging PPA failed to transition aspects of its distribution network to Owl as the Agreement required (Doc. No. 6 at 7–8). This Court is called upon to interpret provisions of the Agreement on dueling Motions for Summary Judgment (Doc. Nos. 7 & 9), and Oppositions (Doc. Nos. 12 & 14).

## BACKGROUND

The parties entered a two-year Agreement in October 2008. Under the Agreement, PPA received a 23 percent discount on Owl's prepaid products. During the term of the Agreement, Owl reduced PPA's discount to 22 percent without enacting similar changes for other distributors (Doc.

No. 10-3 at 3–4). Owl also provided a limited number of free phones to Circle K convenience stores (Doc. No. 12-7 at 4). PPA alleges both of those actions violated the "Purchase Price" provision in Section 7 of the Agreement (Doc. No. 7-2 at 3, ¶ 7).

Prior to 2008, PPA had the exclusive right to sell prepaid phone cards and cell phones supplied by Owl in the southeast United States (Doc. No. 7-2 at 2). The Agreement expanded PPA's territory to 45 states (Doc. No. 7-2 at 10–11, Ex. A). Section 1 of the Agreement required Owl "to engage in good faith discussions" within six months to further expand PPA's territory "to include the entire United States" (Doc. No. 7-2 at 2–3, ¶ 1). Expansion would take "into account Owl's and [PPA's] business needs, [PPA's] performance and Owl's other contractual obligations" (Doc. No. 7-2 at 2–3, ¶ 1). PPA's territory was never expanded, and PPA claims Owl never engaged in good faith discussions.

Section 4 of the Agreement required Owl and PPA to also "engage in good faith discussions to extend the Term of the Agreement" (Doc. No. 7-2 at 4, ¶ 4). On July 9, 2010, Owl Vice President Yassine Yassine and PPA Owner Michael Lizdas spoke by phone to discuss new terms (Doc. No. 12-3 at 36–41). They discussed exclusivity arrangements, pricing, and expanding PPA's territory nationwide (Doc. No. 12-3 at 38–40). PPA contends the result of this conversation was a new agreement to be confirmed in writing (Doc. No. 12-3 at 42).

Four days later, Owl sent PPA a proposed written distribution agreement (Doc. No. 7-5 at 2). PPA alleges the proposed agreement did not match the July 9 conversation (Doc. No. 12-3 at 42–43). Although the exclusivity and territory provisions were included as discussed, the pricing provision no longer guaranteed PPA would receive the lowest prices (Doc. No. 7-5). Additionally, the proposed agreement required PPA to meet obligations contained in a new "Minimum and Annual Purchases"

2

provision -- requiring PPA to purchase $500,000 of prepaid products and activate 10,000 lines per month (Doc. No. 7-5 at 6, ¶ 5). PPA contacted Owl about these sticking points and attempted to negotiate different terms (Doc. No. 19-9 at 12–14). Owl told PPA it would no longer receive the lowest price guarantee; instead, every distributor would receive the same price. PPA claims this violated the oral agreement reached on July 9 (Doc. No. 12-9 at 14).

Owl counterclaimed (Doc. No. 6 at 7–9). Under Section 2.1 of the Agreement, PPA was required to transition some of its distributor accounts to Owl (Doc. No. 7-2 at 3, ¶ 2.1). The Agreement specifically identified two PPA customer accounts -- Blackstone and Budget Prepaid (Doc. No. 7-2 at 3, ¶ 2.1). These accounts were transferred to Owl in late 2008 (Doc. No. 12-4 at 24 & 27–30). But after the transfer, PPA continued to sell some $20 million of products to Blackstone and Budget (Doc. Nos. 8-1 & 8-2). That continued sale forms the basis of Owl's Counterclaim.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1332. As a federal court sitting in diversity, this Court applies Ohio substantive law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the

evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

Moreover, the fact both parties have filed cross-Motions for Summary Judgment "'does not mean that the court must grant judgment as a matter of law for one side or the other.'" *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009) (citing *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991)). But, "[w]hen the facts presented in a case are undisputed, whether they constitute a performance or a breach of a written contract, is a question of law for the court." *Luntz v. Stern*, 135 Ohio St. 225, 237 (1939).

The meaning of a contract is ascertained from its language. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 274 (1999). When that language is clear and unambiguous "[c]ourts will not give the contract a construction other than that which the plain language of the contract provides." *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55 (1989).

## ANALYSIS

PPA raises four claims against Owl for failing to: (1) uniformly apply price changes to every distributor; (2) give PPA the lowest prices; (3) negotiate the expansion of PPA's territory in good faith; and (4) honor the terms of the July 2010 oral renegotiation. This Court will next examine each claim.

**Uniform Prices**

PPA claims Section 7 required Owl to maintain PPA's price differential, and Owl breached the Agreement by lowering PPA's discount from 23 to 22 percent without adjusting other distributors' prices (Doc. No. 12 at 5–8). Section 7 states (Doc. No. 7-2 at 4, ¶ 7):

4

> Owl may, from time to time, supplement or amend the Purchase Price listed on Exhibit C . . . but only if such price change is also applicable to all of Owl's other distributors. Owl hereby warrants and represents that the purchase prices charged to [PPA] are and will continue to be, for the duration of this Agreement, the lowest prices charged to distributors by Owl for Phone Cards and Handsets.

Owl argues Section 7 guarantees that PPA will receive the lowest price and only requires changes to other distributors' prices if they had been "paying the same 'price' as PPA" (Doc. No. 7-1 at 15), and that PPA's "price differential" argument would require "all distributor[s] to stay in 'lockstep' during the term of the [] Agreement" (Doc. No. 7-1 at 15).

Section 7 clearly states Owl may change PPA's prices "but only if such price change is also applicable to all of Owl's other distributors." Nothing in the Section restricts it to only those distributors who pay the same price as PPA, and this Court will not read in such a limitation. *See Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (requiring courts to apply the unambiguous plain language of a contract).

Owl's argument that PPA's "price differential" constitutes a "lockstep" provision fares no better. Section 7 is not equivalent to a "lockstep" provision, because Owl may adjust other distributors' prices without adjusting PPA's price -- so long as PPA still receives the lowest price. Owl also claims such an interpretation makes a "price differential" clause easily avoided, and that this Court should not "impose a meaningless requirement" in the Agreement (Doc. No. 7-1 at 16). True, but Ohio contract law requires this Court to carry out the parties' purpose as "evidenced by the contractual language." *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St. 2d 244, 247 (1974). The purpose of Section 7 is to ensure that if PPA's price is adjusted upwards, other distributors' prices would be adjusted in kind; but other distributors' prices could change so long as PPA continued to receive the lowest prices. This reading gives the Agreement its full effect.

This Court notes PPA's interpretation has problems of its own because it is unclear how "price differential" is calculated -- *e.g.* percentage, dollar amount, or basis points. This Court would expect a well-drafted agreement to define "price differential." No such definition is included. Nevertheless, the language adopted by the parties is clear -- price increases to PPA require a corresponding change to other distributor prices.

Owl alternatively argues PPA's interpretation violates federal antitrust law because a "price differential . . . would constitute an agreement . . . to fix the prices of other distributors . . . ." (Doc. No. 7-1 at 17). According to Owl, PPA's interpretation requires Owl to fix the prices of other distributors without their knowledge (Doc. No. 7-1 at 17). This claim that Section 7 might constitute price-fixing is without record support as Owl provides no evidence how PPA's "price differential" clause implicates antitrust law.

Whether antitrust law is violated is analyzed under either the *per se* test or the "rule of reason." *Bailey's, Inc. v. Windsor America, Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991). Horizontal price-fixing is a *per se* antitrust violation. *Expert Masonry, Inc. v. Boone County, Ky.*, 440 F.3d 336, 344. (6th Cir. 2006). But, as explained above, no price-fixing has occurred, or is required by Section 7. Further, there has been no showing how PPA's interpretation of Section 7 is an antitrust violation under the "rule of reason." *Id.* at 343 (listing the five elements of the *prima facie* case: (1) contract or agreement; (2) anticompetitive effects; (3) affect on relevant geographic markets; (4) illegal intent; and (5) proximate cause of injury).

In any event, whether or not Section 7 prevents Owl from adjusting other distributors' prices is of no concern because that is not what occurred here. Rather, Owl adjusted PPA's price without adjusting other distributors' prices and that is a violation of Section 7's plain language.

6

**Lowest Prices**

PPA also claims Owl violated Section 7 when it failed to give PPA the lowest prices for its prepaid products by giving free phones to Circle K (Doc. No. 12 at 6). This is PPA's lone allegation that Owl provided lower prices to any other entity (Doc. No. 7-8 at 6–9). There is no dispute that Section 7 entitles PPA to the lowest prices or that Owl provided free phones to Circle K. However, Owl argues PPA waived its claim under Section 7 when the parties voluntarily resolved the issue in 2009 and PPA accepted a credit for the phones given to Circle K (Doc. No. 7-1 at 7 & 12–13). Under Ohio law:

> A waiver is a voluntary relinquishment of a known right. It applies generally to all personal rights and privileges. Waiver assumes one has an opportunity to choose between either relinquishing or enforcing [] the right. A waiver may be enforced by the person who had a duty to perform and who changed his or her position as a result of the waiver.

*Chubb v. Ohio Bur. of Workers' Comp.*, 81 Ohio St. 3d 275, 278–79 (1998) (citations omitted).

A party, however, cannot waive its claims without "full knowledge of all the facts." *N. Olmsted v. Eliza Jennings, Inc.*, 91 Ohio App. 3d 173, 180 (Ohio Ct. App. 1993). PPA claims that when it agreed to the credit, it only knew Owl had provided phones to Circle K at lower prices, not that the phones had been provided free (Doc. No. 7-8 at 9). As a result, PPA argues Owl hid the true facts about the Circle K promotion, and PPA was not fully compensated for the price difference (Doc. No. 12 at 8). At this stage, this Court cannot tell whether PPA had "full knowledge" when it agreed to Owl's offered credit.

Nevertheless, summary judgment is appropriate on other grounds. Section 7 provides that the "prices charged to [PPA] . . . [will be] . . . the lowest prices charged to *distributors* by Owl . . . ." (Doc. No. 7-2 at 4, ¶ 7) (emphasis added). Circle K is a retailer, not a "distributor." A "retailer" is

7

a "person or entity engaged in the business of selling personal property to the public or to consumers, as opposed to selling to those who intend to resell the items." BLACK'S LAW DICTIONARY 1341 (8th ed. 2004. Conversely, a "distributor" is a "wholesaler, jobber, or other manufacturer or supplier that sells chiefly to retailers and commercial users." *Id.* at 509.

PPA argues that "distributor" simply means any entity that resells the product. However, the Agreement specifically distinguishes between "retailers" and "distributors" (Doc. No. 7-2 at 3, ¶¶ 2.2 & 2.3), and nothing in the Agreement indicates this Court should adopt a definition of "distributor" that runs contrary to its plain meaning. Because Circle K is a retailer and not a distributor, Owl was not prohibited from selling it phones at a lower price. Accordingly, this claim is dismissed.

**Good Faith Negotiation**

The Agreement requires "good faith discussions in order to determine whether [PPA's] Territory may be expanded . . . ." (Doc. No. 7-2 at 2–3, ¶ 1). Although the Agreement does not define "good faith," Ohio law generally defines good faith performance as "'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *See Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 463 (Ohio Ct. App. 2005) (quoting Restatement (Second) of Contracts § 205 cmt. a). Further, "lack of good faith is the equivalent of bad faith, and bad faith . . . . imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272, 276 (1983) (quotation omitted).

Of course, agreements to negotiate do "not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *Trianco, LLC v. Int'l Bus. Machs. Corp.*, 347

8

Fed. App'x 808, 810 n.4 (3d Cir. 2009) (quotations and emphasis omitted). "An obligation to meet to discuss is an even lighter burden than an obligation to negotiate." *Novelis Corp. v. Anheuser-Busch, Inc.*, 559 F. Supp. 2d 877, 883 (N.D. Ohio 2008).

Here, the lightest burden applies because the Agreement merely requires "discussions." PPA contends these discussions never occurred (Doc. No. 12 at 13–15). But that position is directly contradicted by PPA Owner Lizdas who admits he had at least one conversation with Owl about the expansion (Doc. No. 7-8 at 26). During this conversation, Owl Vice President Yassine explained to Lizdas that Owl was still under other distributor contracts that prevented expansion (Doc. No. 7-9 at 5). This exact scenario was recognized by the Agreement, which specifically states "good faith discussions" regarding expansion were subject to "Owl's other contractual obligations" (Doc. No. 7-2 at 2–3, ¶ 1). PPA has made no showing Owl acted in bad faith by fabricating or otherwise misrepresenting the "contractual obligations" preventing PPA's expansion. This claim is dismissed.

**Oral Agreement**

Finally, PPA contends its negotiations with Owl on July 9, 2010 constituted an oral contract, which Owl breached by sending a materially different written contract and refusing to honor the terms of the conversation (Doc. No. 12 at 16–17). The July 9 conversation was not a contract. If parties agree on all the terms of a contract, yet still "mean to have them reduced to writing and signed before the bargain shall be considered [] as complete, neither party will be bound until that is done . . . ." 1 WILLISTON ON CONTRACTS § 4:11 (4th ed.) (quotation omitted). To determine whether an oral agreement is binding, this Court also considers the intent of the parties, their course of dealing, and whether prior contracts were written. *See Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St. 2d 147, 151–52 (1978) (inferring intent to contract from prior oral contracts).

9

PPA Owner Lizdas admitted that he expected a written document to follow the July 9 conversation and did not believe the business relationship between the parties could continue without such writing (Doc. No. 7-8 at 64–65). Furthermore, the parties have no history of negotiating oral contracts and in fact the Agreement, which the parties were renegotiating, was a written contract. PPA presents no evidence that Owl intended to be bound by the conversation and it is undisputed no final written agreement was ever reached (Doc. No. 12-3 at 48–49). This claim too cannot survive.

**Owl's Counterclaim**

Owl's counterclaim is straightforward. It alleges PPA violated Section 2.1 when it sold prepaid products to Blackstone and Budget after these accounts were transferred to Owl. Section 2.1 provides (Doc. No. 7-2 at 3, ¶ 2.1):

> Owl will begin to transition . . . Blackstone and Budget . . . to Owl. Owl agrees to transition Blackstone and Budget simultaneously. Owl, however, needs time to prepare to assume the obligation of selling . . . and agrees to provide [PPA] with a thirty (30) day advance notice . . . . [PPA] shall thereafter cooperate with Owl in transitioning each PPA Distributor's account to Owl. Effective immediately upon a transition of a PPA Distributor's account . . . Owl shall be responsible for all sales, warranty, and support activities . . . .

The parties dispute when the transfer occurred (Doc. Nos. 7-1 at 19 & 12 at 15, n. 4), but it is undisputed Owl eventually took over both accounts and that PPA continued to sell prepaid products to Blackstone and Budget after the transfer (Doc. No. 12 at 15–16).

PPA claims Section 2.1 only obligated it to cooperate with the transfer. That is incorrect. Section 2.1 clearly states Owl would be responsible for "all sales" to Blackstone and Budget (Doc. No. 7-2 at 3, ¶ 2.1). PPA's sales in this regard violated the clear terms of the Agreement. Owl's Motion for Summary Judgement on its Counterclaim is granted.

**CONCLUSION**

Accordingly, both Motions for Summary Judgment are granted in part and denied in part. The remaining issues to be determined at trial are damages, if any, for PPA's claim under Section 7 and Owl's claim under Section 2.1 of the Agreement.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 16, 2012